UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CRUSH CITY CONSTRUCTION, LLC,

                                                                                     Civil No. 24-1014 (JRT/DTS)

                     Plaintiff,

v.

                                          **MEMORANDUM OPINION AND ORDER**
ENGLERT, INC.,                              **DENYING MOTION TO COMPEL**
                                                 **ARBITRATION**

                   Defendant.

Christopher W. Bowman and Jon R. Steckler, **MADIGAN, DAHL & HARLAN, P.A.**, 33 South Sixth Street, Suite 3675, Minneapolis, MN 55402, for Plaintiff.

Earsa R. Jackson, **CLARK HILL PLC**, 901 Main Street, Suite 6000, Dallas, TX 75202; Erin C. Johnsen, **GARNER, GINSBURG & JOHNSEN, P.A.**, 333 Washington Avenue North, Suite 300, Minneapolis, MN 55401, for Defendant.

Plaintiff Crush City Construction, LLC brings several causes of action against Defendant Englert, Inc. for allegedly violating the terms of their distributor agreements. Englert moves to compel arbitration, alleging that the parties agreed to arbitrate any controversy arising from their relationship. However, because the Court cannot yet determine which of several potential agreements might govern the parties' relationship, the Court will deny the motion and allow the case to proceed to discovery.

**BACKGROUND**

**I.   FACTS**

In 1985, Kevin and Emily Lindus incorporated Lindus Construction.  (Compl. ¶ 7, Mar. 21, 2024, Docket No. 1.)  In 1995, Lindus Construction began operating a seamless gutter franchise of Englert, Inc. ("Englert") in both Minnesota and Wisconsin.  (*Id.* ¶ 8.)  That business grew, and eventually Lindus Construction began operating branded "LeafGuard" franchises throughout the country, including in Michigan, Iowa, and Ohio.  (*Id.* ¶ 9.)

In 2003, Lindus Construction and Englert entered into several distributor agreements to define their territories.  The two relevant agreements for purposes of this litigation are as follows:

- **2003 Rochester Agreement** – Signed in January 2003, this agreement gave Lindus Construction the exclusive right to manufacture, use, and offer to sell the LeafGuard system in counties in southern Minnesota (Dodge, Faribault, Fillmore, Freeborn, Goodhue, Houston, Mower, Olmsted, Rice, Scott, Steele, Wabasha, Winona, Waseca, Blue Earth, and Le Sueur) and southwestern Wisconsin (LaCross and Vernon).  (Ex. A ("Rochester Agreement"), Oct. 29, 2024, Docket No. 18.)

- **2003 Midwest Agreement** – Signed in January 2003, this agreement gave Lindus Construction the exclusive right to manufacture, use, and offer to sell the LeafGuard system in counties in central Minnesota (Anoka, Carver,

Chisago, Dakota, Hennepin, Ramsey, Washington, and Pine) and northwestern Wisconsin (Barron, Burnett, Chippewa, Douglas, Dunn, Eau Claire, Pepin, Pierce, Polk, St. Croix, Sawyer, and Washburn).  (Decl. of Jon R. Steckler ("Steckler Decl.") ¶ 5, Ex. 3 ("Midwest Agreement"), Nov. 19, 2024, Docket No. 24.)

Both agreements contained identical arbitration clauses, which bound the parties to arbitrate "any issue arising out of or relating to this Agreement" in New Brunswick, New Jersey.  (Rochester Agreement § XV(A); Midwest Agreement § XV(A).)  The agreements also contained a choice of law and choice of venue clause that stated any issues would be decided according to New Jersey law and brought only in New Jersey courts.  (Rochester Agreement § XV(E); Midwest Agreement § XV(E).)

Though Lindus Construction had been operating separate offices to service the Rochester and Midwest territories, in 2015, Lindus Construction consolidated its operations and began servicing both territories out of its Baldwin, Wisconsin office space.  (Compl. ¶ 14.)  After the consolidation, Englert allegedly began invoicing Lindus Construction franchise and royalty fees and calculating sales quotas on the combined territory as if it were one operation.  (*Id.* ¶ 17.)

In 2017, Kevin and Emily Lindus began work to transition their family business to their children: Adam, Andrew, and Alex.  (*Id.* ¶ 19.)  To formalize that transition, Lindus Construction executed a Termination Agreement with Englert, which assigned Kevin and

Emily Lindus's rights under the Midwest Agreement and a similar "Cincinnati Agreement"[1] to Adam, Andrew, Alex, and their company, Crush City Construction, LLC ("Crush City"). (*Id.* ¶¶ 20–22.) Englert acknowledged this transition in a letter to Adam, Andrew, and Alex, confirming "that Crush City Constructions [sic] LLC will now own and operate LeafGuard of Cincinnati and Midwest LeafGuard." (*Id.* ¶ 23.)

It does not appear that the Termination Agreement technically assigned the rights under the Rochester Agreement to Crush City. However, because the Linduses had consolidated the Midwest and Rochester territory operations, Crush City alleges that both Englert and Crush City effectively operated as if the Rochester Agreement had been assigned, as well. (*Id.* ¶ 26.) Indeed, once the transition was finalized, Englert continued to forward service requests and leads in the Rochester territories to Crush City, and Crush City continued to service that area and pay royalty payments to Englert for sales in that territory in one bundle with the Midwest territories. (*Id.* ¶¶ 28–29.)

On June 27, 2017, Crush City and Englert entered into two separate franchise agreements that collectively covered the same territories as the prior Midwest Agreement that Englert had with Lindus Construction:

- **2017 Minnesota Agreement** – Signed in June 2017, this agreement made Crush City the exclusive dealer of Englert's LeafGuard system in the

---

[1] Parties have not provided the Cincinnati Agreement to the Court. It does not appear the claims are based on this agreement.

following central Minnesota counties: Anoka, Carver, Chisago, Dakota, Hennepin, Ramsey, Washington, and Pine. (Steckler Decl. ¶ 3, Ex. 1 ("Minnesota Agreement").)

- **2017 Wisconsin Agreement** – Signed in June 2017, this agreement made Crush City the exclusive dealer of Englert's LeafGuard system in the following northwestern Wisconsin counties: Barron, Burnett, Chippewa, Douglas, Dunn, Eau Claire, Pepin, Pierce, Polk, St. Croix, Sawyer, and Washburn. (Steckler Decl. ¶ 4, Ex. 2 ("Wisconsin Agreement").)

Importantly, neither 2017 agreement contained an arbitration clause. Compiling the counties called out explicitly by the 2003 and 2017 agreements generates the following:



Ordinarily, Englert sends its franchisees deficiency notices if they fall behind in sales in any of their territories. (Compl. ¶ 30.) But even though, on paper, the Rochester territories were recording no sales at all after 2017, Englert and Crush City understood that that was merely because the Rochester operation had been fully subsumed by the Midwest operation, so Englert never sent any deficiency notices to Crush City for the Rochester territory. (*Id.* ¶ 30.)

That handshake agreement changed after 2019, when Englert was purchased by private equity firm Audax. (*Id.* ¶ 31.) With new management, Englert began moving aggressively to terminate LeafGuard franchise agreements across the country to return them to corporate ownership. (*Id.* ¶ 32.)

In 2023, Crush City entertained a business opportunity to sell its business to a third party. (*Id.* ¶ 33.) But Englert refused to consent to the sale or transfer of the business to a third party. (*Id.* ¶ 34.) And Englert went one step further: Englert claimed, for the first time, that the transfer of rights from Lindus Construction to Crush City violated the 2003 Cincinnati and Rochester Agreements; therefore, Englert notified Crush City it would be terminating the Cincinnati and Rochester Agreements within 60 days. (*Id.* ¶¶ 36–39.)

II.  **PROCEDURAL HISTORY**

Crush City filed a Complaint against Englert asserting seven different causes of action: (1) Breach of the 2003 Midwest Agreement, (2) Breach of the 2003 Rochester Agreement, (3) Breach of the Minnesota Franchise Act, (4) Breach of the Wisconsin Fair Dealership Law, (5) Estoppel and Breach of Implied Contract, (6) Declaratory Judgment,

and (7) injunctive relief for unfair trade practices. (*See* Compl.) Englert filed a motion to compel arbitration, to the extent any or all of the Complaint invokes the 2003 Agreements, which both include arbitration clauses. (Mot. Compel Arbitration, Oct. 29, 2024, Docket No. 15.)

## DISCUSSION

### I.   STANDARD OF REVIEW

A party that believes a dispute is subject to arbitration may move for an order compelling arbitration and staying the proceedings. 9 U.S.C. § 3. On a motion to compel arbitration and stay proceedings under the Federal Arbitration Act ("FAA"), the Court does not determine the merits of the substantive issues, but simply whether the parties have agreed to submit a particular grievance to arbitration. *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 699 (8th Cir. 2008). When considering such a motion, the Court is therefore limited to determining (1) whether a valid agreement to arbitrate exists between the parties and (2) whether the specific dispute falls within the scope of that agreement. *Pro Tech Indus. Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004).

In determining whether an agreement to arbitrate exists, the Court applies "ordinary state law contract principles." *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

In determining its scope, an arbitration agreement should be construed liberally, with any doubts resolved in favor of arbitration. *See MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005). The party seeking to avoid arbitration bears the burden of proving that the claims at issue are not suitable for arbitration. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

## II.   ANALYSIS

The fundamental problem in this case is that the parties do not agree which, if any, contract governs their relationship. There are a few possibilities, but only some of those possibilities would bind the parties to arbitrate their claims.

First, the governing contract could be the original 2003 Rochester Agreement. That agreement was between Lindus Construction and Englert. It is possible that the rights of that agreement were transferred to Crush City when Kevin and Emily Lindus terminated their business and sold its assets to their children. But that is an open question of fact, especially because the Court has not seen the Termination Agreement, and there are only snippets of Englert's acknowledgement of the transfer in the Complaint. More discovery is needed to determine whether the 2003 Rochester Agreement governs the current relationship between Crush City and Englert, and unless it is established that such an agreement exists, the Court cannot send this case to arbitration.

Second, the governing contract could be the 2017 Minnesota and Wisconsin Agreements between Crush City and Englert. However, each of those agreements have

an exhibit that very clearly outlines which counties are part of the exclusivity agreement. The Rochester Territories are not in that exhibit. At least at this stage, it appears the explicit, written versions of the 2017 Minnesota and Wisconsin Agreements do not govern the parties' relationship. But that determination could change with discovery.

Third, the governing contract could be an implied franchise/dealership agreement between Crush City and Englert for coverage over the Rochester territories based on the parties' course of conduct. Crush City alleges this is true under both the Minnesota Franchise Act and the Wisconsin Fair Dealership Act, as each allow for such agreements to be express or implied and either oral or written. *See* Minn. Stat. § 80C.01, subd. 4(a); Wis. Stat. § 135.02(3)(a). What that agreement looks like, at this stage, is unclear—an implied agreement could simply borrow the terms of the 2003 Rochester Agreement, borrow the terms of the 2017 Minnesota/Wisconsin Agreements, or be something else entirely. Again, this is an outstanding question of fact, so the Court will need the benefit of discovery and perhaps a motion for summary judgment to decide whether this agreement exists.

Finally, there could simply be no agreement whatsoever between Crush City and Englert. If this is the case, Crush City likely has no cause of action against Englert. But because this option is simply the negative of the various agreements above, it again is an open question of fact.

Parties agree that if the 2003 Rochester Agreement governs, they must arbitrate their claims. Theoretically, this could also be true if there is merely an implied contract between the parties to rely on the rights and obligations set forth in the 2003 Rochester Agreement. Parties also seem to agree that if the 2017 Minnesota/Wisconsin Agreements govern, there is no mandatory arbitration.

But "the question [of] whether the parties have a valid arbitration agreement at all is for the court, not the arbitrator, to decide." *Express Scripts*, 516 F.3d at 700 (quotation omitted). That question cannot be resolved on this record. Therefore, it is premature to rule on a motion to compel arbitration at this stage of the litigation, and the Court must deny the motion. Should the record become clear that the 2003 Rochester Agreement governs the parties' relationship, a renewed motion to compel arbitration at the close of discovery may be appropriate.

## CONCLUSION

Crush City thinks Englert violated the terms of their agreement. The problem is, it isn't sure which one. At this stage, the Court isn't sure either, and the record will need to be more fully developed through discovery to determine which agreement governs before the Court can decide whether to send this case to arbitration. Accordingly, the Court will deny the Motion to Compel Arbitration.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Compel Arbitration [Docket No. 15] is **DENIED without prejudice**.

DATED: July 24, 2025
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge